Jason Kuller, NV Bar No. 12244
Rachel Mariner, NV Bar No. 16728
**RAFII & ASSOCIATES, P.C.**
1120 N. Town Center Dr., Suite 130
Las Vegas, Nevada 89144
Telephone: 725.245.6056
Facsimile: 725.220.1802
jason@rafiilaw.com
rachel@rafiilaw.com
*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| RAYSHAWN JENKINS AND CAMERON HICKMON, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>TTEC SERVICES CORPORATION, a domestic corporation; TTEC HOLDINGS, INC, a foreign corporation; and DOES 1 through 50, inclusive,<br><br>Defendants. | Case No.:<br><br>**CLASS AND COLLECTIVE ACTION COMPLAINT**<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. Failure to Pay Wages for Each Hour Worked in Violation of NRS 608.016;<br><br>2. Failure to Pay Overtime in Violation of NRS 608.018<br><br>3. Failure to Timely Pay All Wages Due and Owing at Separation of Employment in Violation of NRS 608.020-050<br><br>**COLLECTIVE ACTION COMPLAINT FOR:**<br><br>4. Failure to Pay Minimum Wage in Violation of the FLSA, 29 U.S.C. § 206 *et seq.*<br><br>5. Failure to Pay Overtime in Violation of the FLSA, 29 U.S.C. § 207 *et seq.*<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs RAYSHAWN JENKINS and CAMERON HICKMON, individually and on behalf of all other persons similarly situated, by their undersigned attorney and for their Class Action and Collective Action, allege as follows:

1

**CLASS & COLLECTIVE ACTION COMPLAINT**

RAFII & ASSOCIATES, P. C.
EXCELLENCE | COMMITMENT | RESULTS

RAFII & ASSOCIATES, P. C.
EXCELLENCE | COMMITMENT | RESULTS

**INTRODUCTION**

1.      This is a class action complaint for unpaid wages and overtime, attorneys' fees, costs, and interest under Nevada Revised Statutes ("NRS") Chapter 608 and the Federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et. seq.*

2.      All allegations in this Complaint are based on information and belief, except for those allegations pertaining specifically to Plaintiffs or their counsel.

3.      Each allegation in this Complaint either has evidentiary support or is likely to have evidentiary support after a reasonable opportunity for further investigation and discovery.

**PARTIES**

4.      Plaintiff CAMERON HICKMON ("HICKMON") is a natural person residing in Clark County, Nevada. At all relevant times, Plaintiff Cameron Hickmon worked for Defendant TTEC Services Corporation in Clark County, Nevada.

5.      Plaintiff RAYSHAWN JENKINS ("JENKINS") is a natural person residing in Clark County, Nevada. At all relevant times, Plaintiff Rayshawn Jenkins worked for Defendant TTEC Services Corporation in Clark County, Nevada.

6.      Plaintiffs CAMERON HICKMON and RAYSAHWN JENKINS (collectively the "Plaintiffs" or "Individual Plaintiffs" or "Plaintiff Hickmon" and "Plaintiff Jenkins") bring this action on behalf of themselves individually, and all Class Members and Collective Members as defined herein.  Any reference in this Complaint to "Plaintiffs" or "Individual Plaintiffs" shall mean any and each of them.

7.      "Class Members" are all current and former hourly workers employed by Defendants at any time during the period from May 30, 2021, until the date of judgment ("Class Period"), who work or worked and were not paid, who work or worked overtime and were not paid, and who worked and work overtime and received bonuses and are or were not paid correctly. (collectively, "the Rule 23 Class").

8.      "Collective Members" are all current and former hourly workers employed by Defendants at any time during the period from May 30, 2022, until the date of judgment ("FLSA Period") who work or worked hours and were not paid, who work or worked overtime and were not

**CLASS & COLLECTIVE ACTION COMPLAINT**

paid, and who work or worked overtime and received bonuses and were not paid correctly.

9.    At all relevant times, Defendant TTEC SERVICES CORPORATION was a domestic corporation licensed to do business under Nevada State Law.

10.    TTEC SERVICES CORPORATION is a wholly-owned subsidiary of TTEC HOLDINGS, INC.

11.    At all relevant times, Defendant TTEC HOLDINGS, INC. ("TTEC Holdings") was a foreign corporation with its primary place of business at 100 Congress Avenue, Suite 1425, Austin TX 78701 licensed to do business under Texas State Law.

12.    TTEC Holdings owns multiple "Customer Engagement Centers" across the United States and the world.

13.    In the United States, TTEC Holdings (through its subsidiaries such as TTEC SERVICES CORPORATION) has Customer Engagement Centers in Arizona, Florida, Massachusetts, Nevada, Georgia, Kansas, North Carolina, Oklahoma, Texas.

14.    TTEC SERVICES CORPORATION ("TTEC Services") employs at least 700 people in its Customer Engagement Center at 3700 S. Maryland Parkway, Suite 200, Las Vegas, NV 89119.

15.    The identities of Does 1-50 ("Doe Defendants") are unknown at this time, and this Complaint will be amended at such a time when Plaintiffs learn of their identities. Plaintiffs are informed and believe that each of the Doe Defendants is responsible in some manner for the acts, omissions, or representations alleged herein.

16.    Any reference in this Complaint to "TTEC", "TTEC Services", TTEC Holdings" "Defendant," "Defendants," "Doe," or "Doe Defendants" shall mean "Defendants and each of them."

## JURISDICTION AND VENUE

17.    Plaintiffs incorporate and reallege all paragraphs above.

18.    Because Plaintiffs' FLSA claims arise under federal law, the Court has federal question jurisdiction pursuant to 28 U.S.C §1331.

19.    In addition, the Court has supplemental jurisdiction over Plaintiff's Nevada state-law claims under 28 U.S.C. § 1367 because those claims derive from a common nucleus of operative fact regarding Defendant's unlawful treatment of Plaintiff, and form part of the same case and controversy.

**CLASS & COLLECTIVE ACTION COMPLAINT**

RAFII & ASSOCIATES, P. C.
EXCELLENCE | COMMITMENT | RESULTS

20.    Venue is proper in this Court because Defendant TTEC Services Corporation is headquartered and operate within this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district. See 28 U.S.C. § 1391(b).

21.    Venue is proper in this Court because Defendants' acts or omissions giving rise to Plaintiff's claims occurred in Clark County.

## **FACTUAL ALLEGATIONS**

22.    Plaintiffs incorporate and reallege all paragraphs above.

23.    Plaintiff Cameron Hickmon worked for Defendants as a Customer Service Representative at their Customer Experience Center on South Maryland Parkway from February 2, 2023 until her employment was suspended on June 17, 2023. Plaintiff Hickmon's base hourly rate of pay was $17.00.

24.    Plaintiff Rayshawn Jenkins worked for Defendants as a Customer Service Representative at their Customer Experience Center on South Maryland Parkway from on or about April 3, 2023 until he resigned around June 27, 2023.  Plaintiff Rayshawn Jenkins' base hourly rate of pay was $17.00.

25.    Specifically, both Plaintiffs were working for TTEC Holdings' wholly-owned subsidiary TTEC Services Corporation.

26.    TTEC Holdings, on its own and through its subsidiaries, enters into contracts to provide Customer Service to various entities with statutory security obligations, such as banks and accountancy practices, for example Bank of America, and healthcare providers, for example Blue Cross/Blue Shield.

27.    In TTEC parlance, work for an individual client with security obligations was called a "Campaign".

28.    Both Plaintiffs worked on the Bank of America Campaign.

29.    At TTEC Services, all Campaigns worked in "Production" – this is what they would call the conference-center sized space for 700 workers.



RAFII & ASSOCIATES, P. C.
EXCELLENCE | COMMITMENT | RESULTS

**CLASS & COLLECTIVE ACTION COMPLAINT**

30.    TTEC Services and TTEC Holdings' other subsidiaries are and were contractually obligated to maintain a secure workplace for all Campaigns in order for their clients to be in compliance with laws such as the Right to Financial Privacy Act and the Health Insurance Portability and Accountability Act (HIPAA).

31.    Hourly employees' personal phones are not permitted in Production.

32.    TTEC Services follows TTEC Holdings' instructions for the layout and security of their Production space.

33.    The maintenance of employee security and monitoring of entry and exit of "Production" or sometimes known as the "Floor" was and is therefore integral and indispensable to TTEC's income stream from financial and health service entities.

34.    TTEC Holdings could not enter into customer services contracts with its customers and employ through TTEC Services and other subsidiaries its workforce if they did not monitor entry and exit of Production or the Floor.

35.    Therefore, as more fully explained below, the time that employees "spent waiting for work" (29 C.F.R. §790(b)) while they were in line for the security check was and is compensable time as without the security screening, the work would not exist.

*Summary of Claims*

36.    Defendants did not compensate their hourly workers for time spent waiting in line for security screening or performing security screening.

37.    As explained below, TTEC Services implemented TTEC Holdings' policy to not pay employees for every hour worked during training.

38.    TTEC Services also implemented TTEC Holdings' policy of not paying hourly employees for each hour worked on campaigns.

39.    TTEC Services implemented TTEC Holdings' policy of declining to pay overtime to hourly employees who worked more than forty hours a week.

40.    These TTEC policies and practices constitute violations of Nevada Revised Statutes and the Fair Labor Standards Act.



**RAFII & ASSOCIATES, P. C.**
EXCELLENCE | COMMITMENT | RESULTS

*Not Paying All Hours Worked: Training Room Time Shaving*

41.    Once accepted for training, an hourly worker's time with TTEC started in the Training Room.

42.    Training would take two or three weeks, or longer if there was not room in Production for the trainees.

43.    There are four training rooms at TTEC Services.

44.    Until training was completed, employees were generally not given a key card, because they were not qualified to enter secure working areas: Production, or the Floor.

45.    Employees' training time was therefore tracked in one of two ways.

46.    Some trainees were given their own access and password. They would be able to use computers in the training room to "clock in" in the morning.

47.    Ms. Hickmon had access and a password. She tracked her own hours.

48.    Mr. Jenkins was not given access and a password during training. The Trainer tracked his hours.

49.    The Trainer in the training room kept a piece of paper she used to tracked the hours of the trainees. This record was used for renumeration of hourly workers rather than the clock-in and clock-out times provided by employees.

50.    The Trainer attendance record was punitive and erroneous.

51.    For instance, Plaintiff Hickmon would clock in at 7:55 for her 8 a.m. – 5 p.m. shift but if she was in the bathroom when the trainer looked for her, the trainer would not follow Ms. Hickmon's clock-in time but would write down the first time that the trainer saw Ms. Hickmon, for example 8:10.

52.    Similarly, if trainees were not in their seats when the trainer looked around, even if the trainee was in the bathroom, the trainer would log the trainee out even if the trainee was still logged in on the time keeping software and was actually working.

53.    Thus, TTEC Services following TTEC Holdings' policy of using the trainer's subjective record rather than the trainee employees' self-reporting.

54.    Trainee employees had no way of knowing the errors that would occur because of the trainer's subjective methodologies, until the paycheck arrived.

55.    When Ms. Hickmon and Mr. Jenkins complained of errors in their training pay, they were met with intimidation and hostility.

56.    The trainer would say "we feel like we are correct."

57.    Trainees who had their hours input by the trainer frequently found when they received their pay checks that all their hours had not been put in the system.

58.    They would then be told it was too late for them to complain.

59.    People who input their hours through "clocking in" also found that somehow their times did not reflect their actual hours worked.

60.    Specifically, Mr. Jenkins had no training periods where his pay reflected his actual hours worked.

61.    Similarly, Ms. Hickmon had no training periods where her pay reflected her actual hours worked.

62.    Mr. Jenkins and Ms. Hickmon complained frequently of this issue during their training period.

63.    Mr. Jenkins' hours were not corrected, Ms. Hickmon's hours were not corrected either.

64.    TTEC has a policy of shaving training time in order to pay their hourly workers less.

*Not Paying All Hours Worked: Security Screenings*

65.    29 C.F.R. §790(b) provides that "if an employee is required to report at the actual place of performance of his principal activity at a certain specific time, his "workday" commences at the time he reports there for work in accordance with the employer's requirement, even though through a cause beyond the employee's control, he is not able to commence performance of his productive activities until a later time. In such a situation the time spent waiting for work would be part of the workday, and section 4 of the Portal Act would not affect its inclusion in hours worked for purposes of the Fair Labor Standards Act."



RAFII & ASSOCIATES, P. C.
EXCELLENCE | COMMITMENT | RESULTS

66.    All hourly workers at TTEC, once they had been assigned to a Campaign in Production (the room beyond the training rooms) were assigned a key card. A key card would have to be read by an electronic scan in a Kiosk in order for hourly workers to automatically "sign in" to work.

67.    The Kiosk was at the second of two "Security Doors" hourly workers would have to pass through. The Security Doors were like airport or hospital security doors with metal detectors. Hourly workers would pass through these doors one at a time in line in the morning.

68.    Key cards were pressed to the Kiosk, one at a time, to gain entry. A successful exchange of data between the key card and the entry system would yield a green light and the door would open, and one person would enter.

69.    An unsuccessful exchange of information between the key card and the entry system would yield a red light and the door would not open. At that time, the hourly employee would then try to swipe several more times.

70.    If the unsuccessful employee's key card had failed before, they may have been in possession of a six or seven-digit "User Access Code" available from HR or the trainer.

71.    At that point, the hourly worker would attempt manual entry of their User Access Code.

72.    Manual entry of the User Access Code was often unsuccessful for user error and would have to be repeated.

73.    If the unsuccessful employee had not failed before, they would have to leave the line and get an access code and then go to the back of the line and retry.

74.    Manual entry of the User Access Code delayed every hourly worker's "clocking in" even further.

75.    Some hourly workers, including Plaintiff Hickmon, would go to find a security guard who would use their own card to scan in the worker.

76.    At least two or three times a week, door access failed in its entirety for all hourly workers destined for Production.

77.    At those times hourly employees would "clock in" using a wall-mounted entry system in Production.

78.     Production was and is a huge space and there were six doors. At each door was a wall-mounted entry system.

79.     Inside Production, each Campaign was organized into a bay.

80.     Hourly workers would walk around to the entrance closest to their bay to begin their day.

81.     The average time Mr. Jenkins and Ms. Hickmon spent from first entering the Las Vegas Customer Experience Center to clocking in was seven to eight minutes a day.

82.     If Mr. Jenkins or Ms. Hickmon were behind an employee or employees with User Access Codes instead of Key Cards this time would be longer.

83.     If Mr. Jenkins' or Ms. Hickmon's key cards failed or User Access Codes failed, they would be in the building for at least ten minutes before they were logged in.

84.     Similarly, if the system failed in its entirety and Mr. Jenkins and Ms. Hickmon walked around to their bay and used the wall-mounted entry system, they would be in the building for at least ten minutes before they were logged in.

85.     TTEC does not stagger start its shifts.

86.     Therefore, all hourly employees working on a certain shift arrive at once.

87.     This increased the amount of time hourly employees spent waiting in line.

88.     All hourly employees at TTEC's Customer Experience Centers log in the same way and were subject to the same security waiting time.

_Not Paying For All Hours Worked, Including Overtime - By Record Manipulation_

89.     Once Plaintiffs were working in Production, both still were chronically under-paid.

90.     Ms. Hickmon witnessed one trainer Chris Hawk-Derr, announce to Production one evening that they would not be paid overtime, and neither Plaintiff were paid any material amounts of overtime.

91.     This was the statement of policy that Plaintiffs found to be the case throughout their employment.



RAFII & ASSOCIATES, P. C.
EXCELLENCE | COMMITMENT | RESULTS

92. However, Plaintiffs and their Class had a mandate to work overtime in the form of not leaving current calls.

93. For instance, Plaintiff Jenkins and Plaintiff Hickmon both provided, on behalf of TTEC's bank client, customer service to bank customers who had been the victims of identity fraud.

94. Calls sorting out identity fraud involved going through multiple transactions and typically took at least thirty minutes.

95. When Plaintiffs were on the phone in the middle of an identity fraud call, TTEC required them to stay on the call until it was ended by the customer, even if their shift was over.

96. Similarly, Plaintiffs had to answer the phone even if it rang at 4:55 and the call wouldn't finish until 5:30 p.m.

97. Plaintiffs would accordingly stay on the call and leave via the security Kiosk when they were finished, which would mean that they had worked between ten and thirty minutes overtime.

98. The frequency of this kind of overtime was about once a week for the Plaintiffs and the Class.

99. Neither Plaintiffs nor the Class they seek to represent were paid for more than forty hours a week when they worked this type of overtime.

100. Further, it was well known among all hourly employees that there was administrative override of their self-reported hours or the times that were scanned on the Kiosk or the wall-mounted.

101. The management would decide to "average out" or "even out" the hours and when hourly workers would complain, management would say that it was as if they were being paid a salary and there was no need to complain.

102. Despite coming to work from 7:55 a.m. until slightly after 5 p.m. every day, and sometimes working longer, Ms. Hickmon's pay checks show that she worked 73 hours, or 75 hours or 78 hours.

103. Ms. Hickmon should have been paid for more than 80 hours in each of her pay periods.

104. Specifically, for instance, for the pay period between June 5, 2023 and June 18, 2023, her pay record reflects that Ms. Hickmon worked 75.49 hours. She does not take any sick leave during this time, nor does she take any vacation. She worked at least 84.18 hours but was paid for 75.49.

RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

105.    TTEC Services Corporation had access to the actual time that Plaintiffs and their Class worked (except for the time they spent in line on the security screenings) through the kiosk records or user access code records or the wall-mounted entry system.

106.    Mr. Jenkins' pay periods would yield a pristine 80 hours a week no matter how many late calls he had.

107.    As in the training times, both Mr. Jenkins and Ms. Hickmon separately complained to their manager and the manager of the Customer Experience Center about their underpayment.

108.    Both Mr. Jenkins and Ms. Hickmon were told that they were too late to complain about the wage theft, or that management disagreed with their assessment.

109.    Both Mr. Jenkins and Ms. Hickmon were aware of a SharePoint system that they could use to report wage theft (unpaid hours).

110.    The SharePoint reports would be shared with their team leads and their team leads were supposed to correct this.

111.    Ms. Hickmon and Mr. Jenkins did not experience any correction of their wage theft.

*Bonuses and the Regular Rate of Pay*

112.    In addition to their hourly pay, Plaintiffs could also earn referral bonuses and incentive bonuses (collectively, "Bonuses") that were offered to non-exempt employees to incentivize recruitment and performance for the benefit of TTEC. These bonuses were based on set criteria and not discretionary.

113.    Bonuses must be included in the calculation of an employee's regular rate of pay, especially when they are not discretionary.

114.    For Ms. Hickmon the overtime calculations seem to be on their face incorrect. For instance, for the pay period ending June 18, 2023, Ms. Hickmon received a referral Bonus of $200 and worked 0.6 hours of overtime, but it appears the regular rate for the overtime paid was 1.5x her hourly rate of $17 and did not include the referral fee.

115.    Thus, this referral bonus was not calculated into Plaintiff Hickmon's total compensation during a given pay period for purposes of calculating the regular rate and paying

11

**CLASS & COLLECTIVE ACTION COMPLAINT**

overtime. For example, Plaintiff Hickmon's overtime for the pay period covering June 5, 2023 to June 18, 2023 did not properly calculate her Referral Bonus into her overtime rate, resulting in an underpayment of overtime.

116.    Despite the demand sent to Defendants for wages due pursuant to NRS 608.140 on March 14, 2025, Defendants continue to refuse to pay Plaintiffs and other similarly-situated employees all wages and damages due and owing within the applicable limitations period.

## CLASS AND COLLECTIVE ALLEGATIONS

117.    Plaintiffs incorporate and reallege all paragraphs above.

118.    At all relevant times, Plaintiffs were employed by Defendants as non-exempt hourly employees with a base straight-time rate of $17.00 an hour.

119.    In addition to their respective hourly pay, Plaintiff Cameron Hickmon earned also earned a referral bonus (collectively, "Bonuses") that was offered to non-exempt employees to incentivize recruitment.

120.    For instance, for the pay period ending June 4, 2023, Ms. Hickmon received a referral fee of $200 and worked 0.6 hours of overtime, but the regular rate for the overtime paid was 1.5x her hourly rate of $17 and did not include the referral fee.

121.    Defendants knew or should have known that the Bonuses paid to Ms. Hickmon and other non-exempt employees must be paid based on the total compensation earned during a given workweek for purposes of calculating the regular rate of pay and overtime.

122.    Defendants had a duty, as well as the financial ability, to compensate Plaintiff and other similarly-situated employees for all hours worked under state and federal laws, but willfully, knowingly, and intentionally failed to do so in order to save money and increase Defendants' profits. Labor costs, after all, are usually the single largest variable cost for any employer – which is why most employers (like Defendants) strive to "fix" or limit this variable cost.

123.    On information and belief, Defendants continue to maintain an unlawful companywide policy or practice of depriving nonexempt employees of their full wages and overtime wages.

**CLASS & COLLECTIVE ACTION COMPLAINT**

RAFII & ASSOCIATES, P. C.
EXCELLENCE | COMMITMENT | RESULTS

124.    To date, Plaintiff and other similarly-situated current and former employees have not been paid all wages, overtime wages, or other compensatory and liquidated damages owed by Defendants.

125.    Despite demand sent to Defendants for wages due on March 11, 2025, Defendants refuse to pay Plaintiffs and other similarly-situated employees all wages and damages due and owing within the applicable limitations period.

126.    Plaintiffs therefore bring this action on behalf of themselves and on behalf of all other similarly-situated current and former employees of Defendants (collectively, the "Similarly-Situated Employees").

127.    At all relevant times, Plaintiffs and Class and Collective Members were each an "employee" within the meaning of the FLSA and Nevada law. *See* NRS 608.010; Nev. Const. Art. XV § 16(8)(b); 20 U.S.C. § 203(e)(g).

128.    At all relevant times, Defendants were each an "employer" of Plaintiffs and Class and Collective Members within the meaning of Nevada law and the FLSA. *See* NRS 608.011; Nev. Const. Art. XV § 16(8)(b); 20 U.S.C. § 203(d)(g).

129.    At all relevant times, Defendants did not pay Plaintiffs and Similarly-Situated Employees for all hours worked by intentionally shaving training time.

130.    At all relevant times, Defendants did not pay Plaintiffs and Similarly-Situated Employees for all hours worked by not paying them for Security Screening time.

131.    At all relevant times, Defendants did not pay Plaintiffs and Similarly-Situated Employees for all hours worked by intentionally shaving Production time.

132.    At almost all relevant times, Defendants did not pay Plaintiffs and Similarly-Situated Employees for overtime by intentionally not paying overtime.

133.    At all relevant times, Defendants did not properly include Bonuses or other nondiscretionary forms of compensation in the regular rate for purposes of paying overtime to Plaintiff and Similarly-Situated Employees.

134.    Plaintiff brings this action as both a class action under Federal Rule of Civil Procedure 23 and also as an FLSA collective action pursuant to 29 U.S.C. §216(b).

**CLASS & COLLECTIVE ACTION COMPLAINT**

135.    Plaintiffs bring their Rule 23 class action on behalf of the following Class Members (hereinafter "Class Members" or the "Wage Theft Class") defined as:

> **All non-exempt workers employed by Defendants or Defendant TTEC Holdings' subsidiaries who underwent training and/or undertook security screenings and/or worked in Production and/or worked overtime at any time during the four-year period (the "Class Period") prior to the filing of the original complaint until the entry of judgment after trial.**

136.    Plaintiff further bring their Rule 23 class action on behalf of the **Waiting Time Penalty Class** (hereinafter "the Nevada Class" or "Nevada Class Members") which is defined as

> **All Nevada Class Members who are former employees of Defendant**

137.    Plaintiffs reserve the right to modify or redefine the Wage Theft Class and the Nevada Class and to add subclasses as appropriate based on further investigation, discovery, and theories of liability.

138.    Plaintiffs bring their FLSA collective action on behalf of the following **FLSA Collective Members** (hereinafter "Collective Members" or the "FLSA Collective") defined as:

> **All non-exempt workers employed by Defendants who underwent training and/or undertook security screenings and/or worked in Production and/or worked overtime at any time during the three-year period (the "FLSA Period") prior to the filing of the original complaint until the entry of judgement after trial.**

139.    Plaintiffs reserve the right to modify or redefine FLSA Collective Class and to add subclasses as appropriate based on further investigation, discovery, and theories of liability.

140.    The Wage Theft Class, Nevada Class and the FLSA Collective overlap such that members of the Wage Theft Class may be members of the FLSA Collective, and vice versa. Plaintiffs are members of the Wage Theft Class, the Nevada Class and the FLSA Collective.

**CLASS & COLLECTIVE ACTION COMPLAINT**

RAFII & ASSOCIATES, P. C.
EXCELLENCE | COMMITMENT | RESULTS

141.    Plaintiffs' Consents to Sue are attached to this Complaint as Exhibit A (Plaintiff Jenkins') and Exhibit B (Plaintiff Hickmon).

## **WAGE THEFT AND NEVADA CLASS ALLEGATIONS**

142.    Plaintiffs incorporate and reallege all paragraphs above.

143.    Class treatment of Wage Theft Class and the Nevada Class is appropriate under Federal Rule of Civil Procedure 23 for the following reasons:

A.    <u>The Class is Sufficiently Numerous</u>: The Wage Theft Class and the Nevada Class members are so numerous that joinder would be impractical, and the disposition of their claims on a class (rather than individual) basis will conserve resources of the parties and judicial system. While the number of Class Members is unknown at this time, this information can be readily ascertained from Defendant's business records. Defendants employ, or have employed, over 900 Class Members in Nevada, and over 6,000 class members nationally during the Class Period.

B.    Common Questions of Law and Fact Exist: Common questions of law and fact exist and predominate as to Plaintiffs and the Wage Theft Class and the Nevada Class members, including, but not limited to:

    i.    Whether Plaintiffs and each Wage Theft Class Member was an "employee" within the meaning of Nevada law;

    ii.    Whether Plaintiffs and each Nevada Class member was an "employee" within the meaning of Nevada law;

    iii.    Whether each Defendant was an "employer" within the meaning of Nevada law;

    iv.    Whether Defendants failed to pay Plaintiffs and the Wage Theft Class for all hours worked, including security screening time, training time and Production time;

    v.    Whether Defendants failed to pay Plaintiffs and the Wage Theft Class at 1 ½ times their regular rate of pay for all hours worked over 8 hours in a workday;

**CLASS & COLLECTIVE ACTION COMPLAINT**

RAFII & ASSOCIATES, P. C.
EXCELLENCE | COMMITMENT | RESULTS

vi.    Whether Defendants failed to include Bonuses in the regular rate for purposes of calculating and paying overtime to Plaintiff and the Wage Theft Class Members;

iii.    Whether Defendants failed to timely pay Plaintiffs and Nevada Class members all wages due and owing upon separation from employment.

C.    <u>Plaintiff's Claims are Typical to Those of Fellow Class Members</u>: Each Wage Theft Class Member and Nevada Class Member is and was subject to the same employment policies, plans, and practices of Defendants during the Class Period, and each sustained damage. Namely, Defendants failed to pay for all hours worked, failed to pay overtime wages for all overtime hours worked; failed to include bonuses in determining the regular rate; and, for the Nevada Class, failed to pay all wages due at separation of employment.

D.    <u>Plaintiffs Are Adequate Representatives of the Nevada Class</u>: Plaintiffs will fairly and adequately represent the interests of the Wage Theft Class members and the Nevada Class members because Plaintiffs are Wage Theft Class members and Nevada Class members, have the same legal and factual issues as Wage Theft Class members and Nevada Class members, and have no interests antagonistic to Wage Theft Class Members and Nevada Class Members. Plaintiffs have retained legal counsel competent and experienced in class actions, including labor and employment litigation. Plaintiffs and their counsel are aware of their fiduciary responsibilities to the Wage Theft Class members and Nevada Class members and are determined to discharge those duties diligently by vigorously seeking the maximum possible recovery for Wage Theft and Nevada Class members.

E.    ***Superiority***: A class action is superior to other available means for the fair and efficient adjudication of this controversy. Each Wage Theft and Nevada Class member has been damaged and is entitled to recovery by reason of Defendants' illegal practice of failing to compensate hourly nonexempt workers in accordance with Nevada wage-and-hour overtime law. Wage Theft and Nevada Class action treatment will permit a relatively large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without unnecessary duplication of effort and expense. Furthermore, the prosecution of individual lawsuits by each Wage Theft and Nevada Class member would present the risk of inconsistent and contradictory judgments,

RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

along with the potential for establishing inconsistent standards of conduct for Defendants and other state employers. Consequently, an important public interest will be served by addressing this matter as a class action.

### FLSA COLLECTIVE ACTION ALLEGATIONS

144.    Plaintiffs incorporate and reallege all paragraphs above.

145.    With regard to conditional certification of the FLSA Collective, Plaintiffs are similarly situated to those Collective Members they seek to represent based on the same factors of commonality, typicality, and adequacy enumerated above.

146.    Upon information and belief, Defendants employ, or have employed, over 500 putative members of the FLSA Collective during the FLSA Period.

147.    For purposes of providing notice to putative members, the names, addresses, email addresses, and phone numbers of FLSA Collective Members are readily available from Defendants. Timely notice of the pendency of this collective action along with a consent to join form can be provided to Collective Members by mail or email, along with posting and distributing copies at Defendants' location.

148.    Plaintiffs and Collective Members are entitled to damages in the amount of their respective unpaid wages, including unpaid straight-time, overtime, and liquidated damages as provided by the FLSA.  See 29 U.S.C. § 206, 207(a), 216(b).

149.    Plaintiff is informed, believes, and thereon alleges that more than 500 putative Collective Members will sign and file consents to join this FLSA collective action.

### FIRST CAUSE OF ACTION
### Failure to Pay Wages for Each Hour Worked in Violation of NRS 608.016
### (On behalf of Plaintiffs and the Wage Theft Class)

150.    Plaintiff incorporates and realleges all paragraphs above.

151.    NRS 608.016 states that "An employer shall pay to the employee wages for each hour the employee works."

RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

152.    Hours worked means anytime the employer exercises "control or custody" over an employee. See NRS 608.011 (defining an "employer" as "every person having control or custody of any employment, place of employment or any employee.").

153.    Pursuant to the Nevada Administrative Code, hours worked includes "all time worked by the employee at the direction of the employer, including time worked by the employee that is outside the scheduled hours of work of the employee." N.A.C. 608.115(1).

154.    TTEC failed to pay Plaintiffs and Class Members for Security Screening Time under the direction and control of TTEC. This violated NRS 608.016, which requires payment for each and every hour worked.

155.    TTEC failed to pay Plaintiffs and Class Members for Training Time by intentionally miscalculating hours worked. This violated NRS 608.016, which requires payment for each and every hour worked.

156.    TTEC failed to pay Plaintiffs and Class Members for time on Campaigns in Production by intentionally shaving or averaging hours. This violated NRS 608.016, which requires payment for each and every hour worked.

157.    Wherefore Plaintiff and Class Members demand payment by TTEC at their regular hourly rate of pay for each and every hour worked during the Class Period, together with attorney's fees, costs, and interest as provided by law.

### SECOND CAUSE OF ACTION
### Failure to Pay Overtime in Violation of NRS 608.018
**(On Behalf of Plaintiff Hickmon and the Wage Theft Class)**

158.    Plaintiffs incorporate and reallege all paragraphs above.

159.    NRS 608.140 provides that an employee has a private right of action for unpaid wages.

160.    NRS 608.018(2) provides that "An employer shall pay 1 ½ times an employee's regular wage rate whenever an employee who receives compensation for employment at a rate not less than 1 ½ times the minimum rate prescribed pursuant to NRS 608.250 works more than 40 hours in any scheduled workweek."

RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS



161.    Here, Defendants improperly calculated the overtime rate of each of the Plaintiffs and Nevada Class members by not including the earned bonuses into the "regular rate" for purposes of overtime.

162.    Here, Defendants declined to pay any overtime and ignored pay records of each of the Plaintiffs, the Wage Theft Class and the Nevada Class members by not paying overtime at all when Plaintiffs, the Wage Theft Class and the Nevada Class members had and have a separate right to overtime worked over 8 hours in a day and 40 hours per workweek without being paid overtime for the hours of compensable time spent waiting in line.

163.    Wherefore, Plaintiffs and Nevada Class members demand payment by Defendants at one- and one-half times their "regular rate" of pay for all hours worked in excess of 8 hours in a day and 40 hours a workweek during the Class Period, together with attorney's fees, costs, and interest as provided by law.

**THIRD CAUSE OF ACTION**
**Failure to Timely Pay All Wages Due and Owing at Separation**
**of Employment in Violation of NRS 608.020-050**
**(On Behalf of Plaintiffs and Nevada Class)**

164.    Plaintiffs incorporate and reallege all paragraphs above.

165.    NRS 608.020 provides that "[w]henever an employer discharges an employee, the wages and compensation earned and unpaid at the time of such discharge shall become due and payable immediately."

166.    NRS 608.030 similarly provides that an employee who resigns or quits must be paid within seven days or on the next regular payroll date, whichever occurs earlier.

167.    NRS 608.040(1) states that "Within 3 days after the wages or compensation of a discharged employee becomes due; or…[o]n the day the wages or compensation is due to an employee who resigns or quits, the wages or compensation of the employee continues at the same rate from the day the employee resigned, quit, or was discharged until paid for 30 days, whichever is less."

168.    NRS 608.050 grants a "lien" to every employee separated from employment for the purpose of collecting any wages or compensation due and owing, including up to 30 additional days of compensation "without rendering any service therefore."

**CLASS & COLLECTIVE ACTION COMPLAINT**

RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

169.    Here, by failing to compensate Plaintiffs and Nevada Class members separated from employment for all hours and overtime hours worked as hereinabove provided, Defendants have failed to timely remit all wages due and owing to Plaintiffs and those Nevada Class members. Wherefore, Plaintiffs and Nevada Class members separated from Defendants' employment demand 30 days of wages and an "employee lien" pursuant to NRS 608.040 and NRS 608.050, together with attorney's fees, costs, and interest as provided by law. Plaintiffs and Nevada Class members also claim a private cause of action to foreclose a lien against Defendants, if necessary, to collect wages due pursuant to NRS 608.050.

## FOURTH CAUSE OF ACTION
### Failure to Pay Minimum Wages in Violation of the FLSA, 29 U.S.C § 206
**(On Behalf of Plaintiff and the FLSA Collective)**

130.    Plaintiffs incorporate and reallege all paragraphs above.

131.    Under the FLSA, "Every employer shall pay to each of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, wages at the [federal minimum wage rate] ...." 29 U.S.C. § 206(a)(l).

132.    By failing to pay Plaintiff and Collective Members any wages whatsoever for otherwise compensable work time, including Security Screening Time, Training Time and Production Time.  Defendants failed to pay Plaintiffs and Collective Members at least federal minimum wage as required by the FLSA because Plaintiffs and Collective Members received no compensation at all for that time.

133.    Defendants' nonpayment in violation of the FLSA has been willful, and Defendants knew or should have known that their policies and practices have been unlawful.

**WHEREFORE**, Plaintiffs and Collective Members demand payment by Defendants at their regular pay rate or the federal minimum wage rate, whichever is higher, for all hours worked during the FLSA Period, plus an additional equal amount as liquidated damages, together with attorney's fees, costs, and interest as provided by law.

**CLASS & COLLECTIVE ACTION COMPLAINT**

RAFII & ASSOCIATES, P. C.
EXCELLENCE | COMMITMENT | RESULTS

RAFII & ASSOCIATES, P.C.
EXCELLENCE | COMMITMENT | RESULTS

**FIFTH CAUSE OF ACTION**
**Failure to Pay Overtime in Violation of the FLSA, 29 U.S.C § 207**
**(On Behalf of Plaintiff and the FLSA Collective)**

170.    Plaintiffs incorporate and reallege all paragraphs above.

171.    The FLSA provides that "[N]o employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C § 207(a)(1).

172.    Here, at all relevant times, Defendants failed to pay one and one-half times the applicable regular rate of pay for all hours worked over forty by Ms. Hickmon, Mr. Jenkins and Collective Members in any given workweek.

173.    Further, Defendants' failure to pay for time shaved off of the time-keeping software was time that frequently should have been paid as overtime because Plaintiffs had already worked forty hours.

174.    Further, Defendants' failure to pay for overtime was an intentional, announced policy that affected all hourly employees.

175.    Defendants' failure to pay overtime to Plaintiffs and Collective Members has been a willful violation of the FLSA. Defendants knew or should have known that their payroll policies and practices were unlawful.

176.    Wherefore, Plaintiffs and Collective Members demand payment by Defendants at one and one-half times their regular rate of pay for all hours worked in excess of 40 hours a week during the FLSA Period, plus an additional equal amount as liquidated damages, together with attorney's fees, costs, and interest as provided by law.

**PRAYER FOR RELIEF**

WHEREFORE Plaintiffs, individually and on behalf of the Wage Theft Class, the Nevada Class and Collective Members and all others similarly situated, prays for relief as follows:

1.      For an order certifying this action as a class action under FRCP 23 on behalf of the Wage Theft Class

2.      For an order certifying this action as a class action under FRCP 23 on behalf of the Nevada Class Members;

3.      For an order conditionally certifying this action as a collective action under the FLSA on behalf of the FLSA Minimum Wage Collective;

4.      For an order conditionally certifying this action as a collective action under the FLSA on behalf of the FLSA Overtime Wage Collective

5.      For an order appointing Plaintiffs as representatives and their counsel as class counsel for the Wage Theft Class Members, Nevada Class Members, and the FLSA Collective;

6.      For damages according to proof of the regular rate of pay under the applicable state or federal law for all hours worked;

7.      For damages according to proof of overtime compensation at one and one-half the regular rate of pay under applicable state or federal law for all hours worked over 40 in a week;

8.      For liquidated damages pursuant to 29 U.S.C. § 216(b);

9.      For 30 days of wages pursuant to NRS 608.040 and 608.050;

10.     For interest as provided by law at the maximum legal rate;

11.     For reasonable attorneys' fees authorized by statute, common law, or equity;

12.     For costs of suit incurred herein;

13.     For pre-judgment and post-judgment interest at the maximum legal rate; and

14.     For such other relief as the Court may deem just and proper.

Respectfully submitted,

DATED: May 30, 2025                    **RAFII & ASSOCIATES, P.C.**


_/s/ Rachel Mariner_____
Rachel Mariner
*Attorneys for Plaintiffs*

**CLASS & COLLECTIVE ACTION COMPLAINT**

RAFII & ASSOCIATES, P. C.
EXCELLENCE | COMMITMENT | RESULTS

# EXHIBIT A

# EXHIBIT A

## CONSENT TO SUE UNDER THE FAIR LABOR STANDARDS ACT

Print Name: Rayshawn Jenkins

1. I hereby consent to be a party plaintiff in a collective action lawsuit against **TELETECH SERVICES CORPORATION, TTEC HOLDINGS, INC.,** and/or any other named defendants ("Defendants") pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*

2. I understand this lawsuit seeks to recover unpaid minimum wages, overtime compensation, liquidated damages, attorneys' fees, costs, and other relief available pursuant to the FLSA.

3. I designate the law firm of RAFII & ASSOCIATES, P.C., and any other attorneys with whom they may associate, as my attorneys in this lawsuit to prosecute my FLSA and related claims.

4. I understand I have the right to pursue my claims individually on my own behalf. I agree to serve as the Class Representative if the Court so approves. If someone else serves as Class Representative, then I designate such Class Representative(s) as my agents to make decisions on my behalf concerning the litigation and all other matters pertaining to this lawsuit.

5. I authorize the law firm and attorneys at RAFII & ASSOCIATES, P.C., to use this consent to file my claims in a separate lawsuit, class/collective action, or arbitration against Defendants.

Signature: _____    Date: 5/15/2025

# EXHIBIT B

# EXHIBIT B

## Consent To Sue Under The Fair Labor Standards Act

Print Name:  Cameron Hickmon
_____

1. I hereby consent to be a party plaintiff in a collective action lawsuit against **TTEC SERVICES CORPORATION, TTEC HOLDINGS, INC.,** and/or any other named defendants ("Defendants") pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201, *et seq.*

2. I understand this lawsuit seeks to recover unpaid minimum wages, overtime compensation, liquidated damages, attorneys' fees, costs, and other relief available pursuant to the FLSA.

3. I designate the law firm of Rafii & Associates, P.C., and any other attorneys with whom they may associate, as my attorneys in this lawsuit to prosecute my FLSA and related claims.

4. I understand I have the right to pursue my claims individually on my own behalf. I agree to serve as the Class Representative if the Court so approves. If someone else serves as Class Representative, then I designate such Class Representative(s) as my agents to make decisions on my behalf concerning the litigation and all other matters pertaining to this lawsuit.

5. I authorize the law firm and attorneys at Rafii & Associates, P.C., to use this consent to file my claims in a separate lawsuit, class/collective action, or arbitration against Defendants.

Signature:  *Cameron Hickmon*
_____    Date:  5/15/2025
_____